J-A06007-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| YAN CARLOS PICHARDO CEPEDA | : | |
| | : | |
| Appellant | : | No. 339 WDA 2025 |

Appeal from the Judgment of Sentence Entered February 11, 2025
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0007596-2023

BEFORE: OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY OLSON, J.: **FILED: July 15, 2026**

Appellant, Yan Carlos Pichardo Cepeda, appeals from the judgment of sentence entered on February 11, 2025, in the Criminal Division of the Court of Common Pleas of Allegheny County. After careful review, we affirm.

Appellant challenges an order that denied his motion to suppress evidence seized by law enforcement agents during a search that occurred on August 31, 2023. Accordingly, we have recounted the trial court's apt summary of the testimony of Agent Thomas Snyder (Agent Snyder), the Commonwealth's sole witness at Appellant's suppression hearing. **See** **Commonwealth v. Guess**, 2024 WL 2021793, *2 (Pa. Super. May 7, 2024) (non-precedential decision) ("Our scope of review of suppression rulings

includes only the suppression hearing record and excludes evidence elicited at trial."), *appeal denied*, 328 A.3d 1000 (Pa. 2024).[1]

> At a hearing on Appellant's *habeas corpus* petition held on July 24, 2024, [Agent Snyder detailed] his experience and training in narcotics investigations with the Strategic Response Team, an investigative unit housed within the Bureau of Narcotics of the Office of the Attorney General. Agent Snyder testified that he worked with confidential informants, performed hundreds of arrests, and executed numerous search warrants related to the trafficking of controlled substances, including heroin, fentanyl, methamphetamine, and marijuana.
>
> [On August 31, 2023, Agent Snyder took part] in an interdiction detail assigned to the Pittsburgh Greyhound Bus Station that looked for buses coming from "source cities," which are cities known to supply large quantities of narcotics to Pittsburgh. [According to Agent Snyder, the detail had conducted over ten interdictions at the bus station and had seized over seven kilos of fentanyl and cocaine]. He identified New York and Philadelphia as the two main source cities for these substances. [Members] of the interdiction detail attempted to interact with as many people as possible, but no one in the unit had specific information about couriers traveling from a source city [on August 31, 2023].
>
> [At 11:00 a.m.], a bus that had traveled from New York and through Philadelphia arrived at the Greyhound Bus Station in Pittsburgh. When the bus arrived, there were a number of plain clothes agents positioned throughout the terminal, and there was also a uniformed K-9 team stationed at the exit. Appellant was

_____

[1] Agent Snyder originally testified at a hearing on Appellant's petition for a *writ* of *habeas corpus*, which occurred on July 24, 2024. At the outset of Appellant's suppression hearing on October 29, 2024, the parties agreed to incorporate the transcript of the *habeas corpus* hearing into the suppression record. *See* Appellant's Brief at 14. The Commonwealth then called Agent Snyder to appear in-person before the suppression court, and he offered the same testimony that he had during the *habeas corpus* hearing. As such, the record of Appellant's suppression hearing consisted entirely of Agent Snyder's testimony, including his live testimony and the transcript of his testimony from Appellant's *habeas corpus* hearing.

observed as he exited the bus and entered the terminal. According to Agent Snyder, he carried a black backpack and had a wheeled black suitcase. When Appellant observed the K-9 team, he turned and walked at a quick pace in the opposite direction, which drew the attention of law enforcement. Appellant then entered a [public] bathroom and was followed by [another agent] who entered just as Appellant was leaving the [restroom facility]. The [a]gent noted a heavy odor of cologne in the bathroom, which was not typical. Agent Snyder explained that, in his experience, drug traffickers occasionally [relied] upon scented products such as dryer sheets, coffee grounds, and heavy doses of cologne to avoid detection by K-9 officers.

Appellant was observed walking toward the bus station exit without looking around the terminal. He then proceeded to a customer service desk and remained there for a few minutes before quickly proceeding outside. Agent Snyder believed Appellant was trying to create distance between himself and law enforcement. Agent Snyder followed Appellant outside and noticed that he had approached a zTrip taxi, held a "two second" conversation with the driver, and started placing his bags in the vehicle. Based upon these observations, Agent Snyder concluded that Appellant was trying to depart from the station and avoid law enforcement. Therefore, Agent Snyder approached Appellant to talk to him.

Appellant was not restrained and there was no show of force [as Agent Snyder approached]. Agent Snyder, who noted a strong odor of the cologne, informed Appellant what the interdiction detail was doing in the bus station, why it was in the area, what its job was, and what it did. The agent asked Appellant why he had traveled to Pittsburgh and Appellant responded that he had come for a two-to-three-day vacation and to visit a girl. Agent Snyder observed that Appellant's hands were visibly shaking as he used his cellular telephone to show the agent his bus ticket.

Based on the entire exchange, Agent Snyder told Appellant his statements did not make sense and asked Appellant for consent to search his bags. Appellant asked why, and Agent Snyder explained that he wanted to "check everything out" since Appellant travelled to Pittsburgh on vacation. [At this time, Agent

Barna[2] (who had been standing nearby) began to approach the area where Agent Snyder was speaking to Appellant. Agent Snyder recalled that he and Agent Barna were both dressed in displayed.]

Appellant then [agreed to permit Agent Snyder and Agent Barna to] search his backpack and suitcase. When Agent [Barna] opened the backpack, he recovered a package wrapped in cargo shorts which, based on its appearance, resembled a kilogram of narcotics. An ensuing search of Appellant's suitcase [by other agents] yielded [approximately] nine kilograms of white powder which, at the time, looked to be either cocaine or fentanyl. Appellant was then arrested and transported to a nearby [police station].

Trial Court Opinion, 5/19/25, at 2-6 (cleaned up).

On August 31, 2023, the Commonwealth charged Appellant with two counts of possession with intent to deliver a controlled substance (PWID), 35 P.S. § 780-113(a)(30), and two counts of simple possession, 35 P.S. § 780-113(a)(16). All charges were bound over to the trial court at the conclusion of a preliminary hearing on October 10, 2023.[3]

---

[2] We have been unable to locate Agent Barna's first name in the certified record.

[3] On July 9, 2024, Appellant, through appointed counsel, filed a petition for *writ* of *habeas corpus* asserting that, although the record indicated that a preliminary hearing had been held, no transcript from that proceeding could be located. Therefore, Appellant asked for the dismissal of the charges against him, unless the Commonwealth came forward with *prima facie* evidence to support its case.

A hearing on Appellant's petition was held on July 24, 2024, and Agent Snyder testified on behalf of the Commonwealth. Toward the conclusion of the hearing, Agent Snyder confirmed that the materials recovered from Appellant's backpack tested positive for cocaine and weighed approximately 1.1 kilograms. N.T., 7/24/24, at 52-53. He also confirmed that the nine
*(Footnote Continued Next Page)*

On August 30, 2024, Appellant moved to suppress the evidence recovered by law enforcement agents and the trial court convened a suppression hearing on October 29, 2024. At the hearing, the parties incorporated the transcript from Appellant's *habeas corpus* hearing into the suppression record, and the Commonwealth introduced additional testimony from Agent Snyder. After the evidence was received, defense counsel argued that the interaction between Appellant and the investigating agents evolved from a mere encounter into an investigative detention, which had to be supported by reasonable suspicion. Counsel then asserted that Appellant's detention was unlawful because the agents lacked reasonable suspicion that Appellant was engaged in criminal activity. The Commonwealth responded that the interaction constituted a mere encounter that required no level of suspicion. Even if an investigative detention occurred, the Commonwealth reasoned, the agents possessed reasonable grounds to suspect that Appellant was engaged in criminal activity. On November 7, 2024, the trial court denied Appellant's motion to suppress, concluding that, since a reasonable person in Appellant's circumstances would not have felt restrained, Appellant's interaction with law enforcement on August 31, 2023 constituted a mere

_____

kilograms of material discovered in Appellant's suitcase did not test positive for the presence of controlled substances. *See id.* at 53. After Agent Snyder confirmed that controlled substances were not present in the material recovered from Appellant's suitcase, the Commonwealth withdrew one count of PWID and one count of simple possession. *See id.* at 57.

encounter and required no particular level of suspicion. ***See*** Trial Court Opinion, 5/19/25, at 7.

Appellant proceeded to a stipulated, non-jury trial on February 6, 2025. The trial record incorporated the hearing transcripts from the prior *habeas corpus* and suppression proceedings, together with a laboratory report showing that the agents recovered approximately 1,000 grams of cocaine from Appellant. On February 11, 2025, the court found Appellant guilty of simple possession and PWID and imposed a standard-range sentence of five to 10 years in prison for PWID and no further penalty for simple possession. This appeal followed.[4]

Appellant raises a single issue for our review.

> Whether the trial court erred in denying [Appellant's] motion to suppress, where the interaction between the law enforcement officers and [Appellant] escalated from a mere encounter to an investigative detention without reasonable suspicion of criminal activity?

Appellant's Brief at 8.

Appellant challenges a ruling in which the trial court denied his motion to suppress. Our standard and scope of review in such cases is well-settled.

> This Court, in reviewing the denial of a motion to suppress evidence, determines whether the record supports the findings of fact and whether the suppression court's legal conclusions are correct. ***Commonwealth v. McFarland***, 278 A.3d 369, 377 (Pa. Super. 2022), *citing* ***Commonwealth v. Yandamuri***, 159 A.3d 503, 516 (Pa. 2017).

---

[4] Both Appellant and the trial court complied with Pa.R.A.P. 1925.

We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, [Appellant] is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review [on] suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Rivera*, 311 A.3d 1160, 1164 (Pa. Super. 2024) (citation omitted), *appeal denied*, 325 A.3d 1024 (Pa. 2024).

At a suppression hearing, the Commonwealth has the burden of establishing by a preponderance of the evidence that the evidence was properly obtained. The preponderance of the evidence is the lowest burden of proof in the administration of justice, and it is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly in one's favor.

*Commonwealth v. Easter*, 331 A.3d 675, 679–680 (Pa. Super. 2025) (internal case citations and quotations omitted), *appeal denied*, 345 A.3d 1199 (Pa. 2025). In deciding whether the Commonwealth has met its burden, the suppression court judge is entitled to believe all, part or none of the evidence presented. *See id*.

The trial court held that Appellant's encounter with Agent Snyder was a mere encounter that required no level of police suspicion. *See* Trial Court Opinion, 5/19/25, at 6-8. Appellant now challenges this assessment, claiming that while his interaction with Agent Snyder may have begun as a mere encounter, it evolved into an investigative detention when a second agent approached, and Agent Snyder explained that he wanted to search Appellant's bags in order to "check everything out" since he did not believe Appellant's

reasons for traveling to Pittsburgh.  **See** N.T., 7/24/23, at 24.  Under such circumstances, Appellant argues that no reasonable person in his shoes would feel free to leave; hence, he was subject to an investigative detention which had to be supported by reasonable suspicion.

"[T]he purpose of both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution is to protect citizens from unreasonable searches and seizures." **In re D.M.**, 781 A.2d 1161, 1163 (Pa. 2001).  To guard against unreasonable governmental intrusion, Pennsylvania courts have identified three classes of police-citizen interactions, each of which requires a unique and more demanding justification as the level of police intrusion implicit in the encounter intensifies. **See Commonwealth v. Maxon**, 798 A.2 761, 766 (Pa. Super. 2002) ("To secure the right of citizens to be free from [intrusions upon personal liberty in the absence of just cause], courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive.").  Our prior cases have explained:

> The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a **Terry** stop, **see Terry v. Ohio**, 392 U.S. 1 (1968); and (3) a custodial detention. **See Commonwealth v. Jones**, 874 A.2d 108, 116 (Pa. Super. 2005).
>
> "A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen.  The hallmark of this interaction is that

it carries no official compulsion to stop or respond," ***Commonwealth v. DeHart***, 745 A.2d 633, 636 (Pa. Super. 2000) (internal citations and quotations omitted), and therefore need not be justified by any level of police suspicion. ***Commonwealth v. Polo***, 563 Pa. 218, 759 A.2d 372, 375 (2000).

"In contrast, an 'investigative detention' ... carries an official compulsion to stop and respond .... Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity." ***DeHart***, 745 A.2d at 636[.]

Finally, "a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest." ***DeHart***, 745 A.2d at 636. This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime. ***See Commonwealth v. Ellis***, 662 A.2d 1043, 1047 (Pa. 1995), *citing **Dunaway v. New York***, 442 U.S. 200 (1979).

***Commonwealth v. Mackey***, 177 A.3d 221, 227 (Pa. Super. 2017).

We agree with the trial court that Appellant's interaction with Agent Snyder began as a mere encounter. Initially, Agent Snyder approached Appellant on his own and informed Appellant that he worked for the state attorney general's narcotics task force as part of a drug interdiction detail that was present in the bus station to look for drug couriers arriving from source cities. ***See*** N.T., 7/24/23, at 10 and 22. The agent then asked Appellant if the two could speak and why Appellant had traveled to Pittsburgh. ***See id***. at 22. Appellant responded that he traveled to Pittsburgh to visit a girl during a short, two-to-three day stay; in addition, Appellant, using his cellular telephone, showed Agent Snyder his bus ticket and a hotel reservation. ***See id***. At this time, Appellant was not restrained and there was no show of official

compulsion by law enforcement personnel. Under the totality of circumstances, we agree that this initial inquiry carried no obligation to stop or respond and, thus, required no level of police suspicion. Of course, this does not end our inquiry, as we must now consider whether the initial encounter evolved into an investigative detention.

This Court recognizes that police-citizen encounters may transform as they unfold, as Appellant suggests.

> No constitutional provision prohibits police officers from approaching citizens in public to make inquiries of them. If, however, the police action becomes too intrusive, a mere encounter may be regarded as an investigatory detention or seizure. [**Commonwealth v. Beasley**, 761 A.2d 621, 624 (Pa. Super. 2000), *appeal denied*, 775 A.2d 801 (Pa. 2001)]. To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, police have conducted a seizure of the person involved. **See Commonwealth v. Mendenhall**, 715 A.2d 1117, 1119 (Pa. 1998).
>
> To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that [he] was not free to decline the officers' requests or otherwise terminate the encounter. Stated differently, we ask whether a reasonable person, innocent of any crime, would have thought he was being restrained if he had been in the defendant's shoes. **See Beasley**, 761 A.2d at 625.
>
> In applying this test, it is necessary to examine the nature of the encounter. Circumstances to consider include, but are not limited to, the following: the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. **See Beasley**, 761 A.2d at 624.

*Maxon*, 799 A.2d at 766.

After Appellant responded to Agent Snyder's inquiries, the agent explained that he did not find Appellant's responses to be credible and asked Appellant for consent to search his bags in order to "check everything out." *See* N.T., 7/24/24, at 24. At this moment, Agent Barna approached and joined Agent Snyder and Appellant. Both Agent Snyder and Agent Barna displayed their badges. *See id.* at 25. In prior cases, we have held that when multiple officers confront a suspect and suggest the individual is suspected of criminal activity, the encounter constitutes an investigative detention because a reasonable person in similar circumstances would not have felt free to leave. *See Commonwealth v. Parker*, 161 A.3d 357, 363 (Pa. Super. 2017), *quoting Commonwealth v. Martin*, 705 A.2d 887, 891 (Pa. Super. 1997). Thus, at that point, the encounter between Appellant and the agents became an investigative detention. Although we conclude that Appellant was subject to an investigative detention, we nevertheless hold that he is not entitled to relief since Agent Snyder possessed reasonable suspicion that Appellant was engaged in criminal activity.

The following principles govern our assessment of whether the Commonwealth proved that Appellant's detention was supported by reasonable suspicion.

> [To] determine whether [a] police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to the

- 11 -

specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his [or her] experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Sloan*, 303 A.3d 155, 164 (Pa. Super. 2023), *quoting*

*Commonwealth v. Smith*, 917 A.2d 848, 852 (Pa. Super. 2007); *see also*

*Commonwealth v. Graham*, 353 A.3d 225, 230 (Pa. Super. 2026).

"Reasonable suspicion is dependent on both the quantity and quality of the

information police possess prior to detaining an individual." *Commonwealth*

*v. Jefferson*, 256 A.3d 1242, 1248 (Pa. Super. 2021), *appeal denied*, 268

A.3d 1071 (Pa. 2021). The police officer "must be able to articulate something

more than an inchoate and unparticularized suspicion or hunch." *Jefferson*,

256 A.3d at 1248-1249, *quoting United States v. Sokolow*, 490 U.S. 1, 7

(1989). "[T]he fundamental inquiry is an objective one, namely, whether the

facts available to police at the moment of the intrusion warrant [an individual]

of reasonable caution in the belief that the action taken was appropriate."

*Jefferson*, 256 A.3d at 1248.

Here, the suppression record established that Agent Snyder possessed

reasonable suspicion to subject Appellant to an investigative detention. Agent

Snyder testified that Appellant arrived at the Pittsburgh bus station on a bus

that had departed from New York and had previously stopped in Philadelphia,

two cities known as sources for narcotics distributed in the Pittsburgh area.

*See* N.T., 7/24/24, at 10. As Appellant moved through the bus terminal, he avoided uniformed law enforcement and canine officers and made his way into a public restroom. *See id.* at 15. An agent who entered the bathroom as Appellant was leaving detected a strong odor of cologne and advised Agent Snyder that Appellant had been alone in the facility.[5] *See id.* at 16. Agent Snyder testified that the restroom facility did not typically smell like cologne. *See id.* In addition, through training and experience, Agent Snyder was aware that drug traffickers used scented products such as cologne to mask the smell of contraband. *See id.* at 17. Thereafter, Agent Snyder observed Appellant wait briefly at a ticket counter and then quickly exit the terminal and attempt to board a taxi and leave the terminal area. *See id.* at 19. Agent Snyder believed Appellant's conduct was unusual, explaining it was inconsistent to wait for a ticket and then quickly depart the terminal in an apparent hurry to depart the area, and determined that Appellant had been motivated by the desire to avoid law enforcement. *See id.* at 18-20. For this reason, Agent Snyder approached Appellant to begin his inquiries. *See id.* at 20. Based upon the totality of circumstances, we conclude that Agent Snyder's observations of Appellant in the Pittsburgh bus station (prior to the commencement of any police-citizen interaction), together with Agent

---

[5] Members of the interdiction task force wear ear pods and share a communication line which allows them to talk with each other in real time. *See* N.T., 7/24/24, at 16.

Snyder's experience and training as a law enforcement officer, would justify an individual of reasonable prudence in believing that Appellant was engaged in criminal activity.[6]   Because Agent Snyder had reasonable suspicion to subject Appellant to an investigative detention, we hold that Appellant was not entitled to suppression.  Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/15/2026

---

[6] Because Agent Snyder relied on his training, experience, and specific observations of Appellant's incriminating conduct at the Pittsburgh bus station, we find the circumstances of this case to be distinguishable from **Commonwealth v. Bennett**, 604 A.2d 276 (Pa. Super. 1992) and **Commonwealth v. Lewis**, 636 A.2d 619 (Pa. 1994), two cases in which Pennsylvania appellate courts said that conduct consistent with that of innocent travelers and mere superficial matches between a suspect's conduct and drug courier profiles will not establish the required reasonable suspicion to support an investigative detention.